**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

DONNA M. SPRY, et al.,

                           Plaintiff,

v.                                    CIVIL ACTION NO. 2:16-cv-01785

THE STATE OF WEST VIRGINIA, et al.,

                           Defendants.

**MEMORANDUM OPINION AND ORDER**

Before the Court are Defendants' Motion for Summary Judgment and Motion to Strike. (ECF Nos. 44, 63.) As discussed below, Court **DENIES** the Motion to Strike and **GRANTS** the Motion for Summary Judgment.

## *I.* *BACKGROUND*

On January 29, 2014, Plaintiff Donna Spry called 911 from her home in rural Harts, West Virginia, to request an ambulance for her husband. Curley Spry was, in his wife's words, depressed and "very, very suicidal." (911 Tr. 2:15–20, ECF No. 59-1.)[1] Ms. Spry told the dispatcher her husband had run out of his prescribed sleeping medication and had not slept in days. As Ms. Spry spoke, her husband cried and held a loaded 9-millimeter pistol to his head. (*Id.* at

---

[1] The parties submitted separate transcripts of the conversation between the 911 dispatcher and Donna Spry on January 29, 2014. The transcripts were presumably prepared from an audio recording, although the audio recording was not submitted to the Court. The transcripts differ slightly—though not, as far as the Court can tell, in any meaningful way. In fairness to Plaintiffs, the Court cites exclusively the transcript they provided. (911 Tr., ECF No. 59-1.)

3:4–5.)  The emergency dispatcher advised Ms. Spry that she could not send an ambulance crew into such a volatile situation.  She suggested dispatching the police instead. "Do you see what I'm saying?" the dispatcher asked.  "I'm going to have to get the police over there and get all that cleared up before we can talk about getting him to the hospital.  Okay?"  (*Id.* at 5:3–6.)  Ms. Spry agreed: "Okay. Are they on their way?"  (*Id.* at 5:7.)

While remaining on the phone with Donna Spry, the emergency dispatcher radioed local law enforcement for help.  Defendant Silas Belt, a West Virginia State Police ("WVSP") Trooper, accepted the transmission.  The dispatcher described the situation, saying: "I've got a 42-year-old male, very suicidal . . . he's sitting holding a 9-millimeter to his head."  (*Id.* at 19:22–20:2.) Trooper Belt radioed back and forth to the dispatcher as he found his way to the Spry residence, a half-hour's drive away.  (Belt. Aff. ¶ 11, ECF No. 44-3.)

Meanwhile, the dispatcher continued to converse with Ms. Spry to glean details about what Trooper Belt could expect upon arrival.  Ms. Spry told the dispatcher that she and her daughter Britney, seventeen years of age at the time, had barricaded themselves in a back bedroom with the door locked.  (911 Tr. 4:16–17.) Mr. Spry remained reclined on the mattress in his bedroom. When Ms. Spry ventured out to check on him, she reported that Mr. Spry refused to lower his gun and was pulling the trigger, making an audible "clicking" noise.  (*Id.* at 7:14.)  She also told the dispatcher that police previously used a Taser against Mr. Spry when he "went psychotic" on his medication. (*Id.* at 10:12.)   The dispatcher relayed all this information to Trooper Belt.  (*Id.* at 23:20–22, 24:9–12, 25:22–23.)

Trooper Belt eventually arrived at the Spry home, followed shortly thereafter by WVSP Sergeants J.C. Dotson and L.D. Hensley, who had been called upon to assist Trooper Belt.[2]

---

[2] As explained further below, Sergeants Dotson and Hensley have not been named parties to this action.

(Dotson Statement, ECF No. 44-3 at 15.) Sergeant Hensley remained outside while Trooper Belt and Sergeant Dotson approached the home. The main door to the home was open; the external screen door remained closed. (Belt Aff. ¶ 20.) Trooper Spry announced his presence by yelling, "State Police!" (911 Call Tr. at 14:19.) Through the door, he saw Ms. Spry standing with the phone in her hand, still in conversation with the 911 dispatcher. (Belt Aff. ¶ 23.) Ms. Spry pointed toward Mr. Spry's bedroom without saying a word. (*Id.*; D. Spry Statement 6, ECF No. 44-2.) Trooper Belt opened the door and entered the home, walking toward Mr. Spry's bedroom. Sergeant Dotson followed behind him, as did Ms. Spry. (Belt Aff. ¶ 27; Statement of D. Spry 6.)

From outside the bedroom, Trooper Belt identified himself and told Mr. Spry "he was not in trouble." (Belt Aff. ¶ 29.) Trooper Belt could not see Mr. Spry from the doorway of the bedroom, as the room was dark. Still, he was able to confirm Mr. Spry's general location when Mr. Spry said, "[D]on't come in here." (Belt Aff. ¶ 30; Dotson Statement 1, ECF No. 44-3 at 15.) Trooper Belt stepped into the room, using his flashlight to locate Mr. Spry, and observed him sitting in bed with a pistol in his right hand. (Belt Statement 1, ECF No. 44-3 at 14.) Trooper Belt attests that he commanded Mr. Spry to drop the gun. (Belt Aff. ¶ 34.) "Instead," Trooper Belt claims, Mr. Spry "lifted the pistol and aimed it at me," saying "I told you not to come in here."[3] (*Id.* ¶ 36.) Trooper Belt then shot Mr. Spry and killed him.[4]

---

[3] Plaintiffs dispute these facts, yet Donna Spry acknowledges that she was not in Mr. Spry's bedroom shortly before his death and could not observe whether he was armed. In a recorded statement given to law enforcement on the day of the shooting, Ms. Spry indicated that from her position outside of the bedroom, all she could see was "[t]he back of the troopers." (D. Spry Statement 7.) Britney Spry was in her bedroom during the incident and does not claim to know what happened. (B. Spry Dep. 5:18–22, 6:8–13, ECF No. 44-2.)

[4] Sergeant Dotson submitted a typewritten statement in response to the shooting. Sergeant Dotson, who had positioned himself on the opposite side of the bedroom door, also saw Mr. Spry lying on the bed, pistol in hand, before his death. (Dotson Statement 1.) Sergeant Dotson reported that as he stepped back out of Mr. Spry's view, he heard Mr. Spry say "do not come in here." (*Id.*) Sergeant Dotson heard Trooper Belt order Mr. Spry to drop the gun and then observed Trooper Belt discharge his weapon in the direction of Mr. Spry.

Ms. Spry remained on the phone call with the 911 dispatcher up through the time of her husband's shooting. In response to the dispatcher asking, "Ma'am? Ma'am, can you tell me what's going on?" Donna Spry responded, "I don't know. All I heard was all kinds of shots." (911 Tr. 15:17–20.) Trooper Belt ran to his police cruiser to request emergency medical services. He returned to the house and asked Donna and Britney Spry to wait outside while his colleagues secured the scene. (Belt Aff. ¶ 43.) They refused, and Trooper Belt did not press the point. (*Id.* ¶ 44, Donna Spry Dep. 63:22–64:2, ECF No. 44-1.) Emergency medical personnel arrived and pronounced Mr. Spry dead. (Report of Investigation, ECF No. 44-3 at 10.)

On January 25, 2016, Ms. Spry and her daughter, Britney Spry, brought suit in West Virginia state court against the WVSP, Trooper Belt, Sergeant R.L. Frye,[5] Superintendent Colonel C.R. Smithers, and an unnamed John Doe Trooper allegedly present at the shooting. Defendants removed the case to federal court and moved to dismiss on Rule 12(b)(6) grounds. In ruling on the motions to dismiss, the Court dismissed Sergeant Frye and Superintendent Smithers as defendants. The Court further winnowed Plaintiffs' claims by dismissing Counts II, III, IV, VII, VII, XII, XIV, XV, XVI, XVII, and XVIII *en toto*, as well as the federal claims asserted in Counts V and VI against the WVSP. Seven counts remain: against Trooper Belt, Count I for excessive force under 42 U.S.C. § 1983, Count V for illegal entry and Count VI for unlawful seizure of Plaintiffs Donna and Britney Spry, arising under § 1983 and West Virginia Constitution Article III § 6; against the WVSP, Counts V and VI under state law; and against both Trooper Belt and the WVSP, Count IX for wrongful death, Count X for battery, Count XI for trespass, and Count XIII for intentional infliction of emotional distress.

---

[5] Sergeant Frye reported to the Spry home on January 29, 2014 at some point following the shooting.

The WVSP and Trooper Belt (henceforth "Defendants") now move for summary judgment on each remaining claim. They also move for the dismissal of John Doe, as the use of fictitious parties is disfavored in federal practice and Plaintiffs have yet to substitute a known defendant for this placeholder.

The deadline for Plaintiffs' response to the summary judgment motion passed. One week later, Plaintiffs filed a motion for extension of time to file a responsive brief. The Court granted the motion and Plaintiffs filed their response as directed on March 27, 2017. Two days later, Plaintiffs submitted two exhibits in support of their responsive memorandum—photographs of the deceased on his deathbed, the mattress beneath him bloodied and his pistol visible on the floor to his side. Defendants filed a reply in support of their motion and moved to strike the belatedly-filed photographs. Because consideration of the photographs does not alter the Court's ruling on the summary judgment motion, the Court will **DENY** the motion to strike. (ECF No. 63.)

## II.     LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. That rule provides, in relevant part, that summary judgment should be granted if "there is no genuine issue as to any material fact." Summary judgment is inappropriate, however, if there exist factual issues that reasonably may be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). When construing such factual issues, the Court must view the evidence "in the light most favorable to the [party opposing summary judgment]." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The moving party may meet its burden of showing that no genuine issue of fact exists by use of "depositions, answers to interrogatories, answers to requests for admission, and various documents submitted under request for production." *Barwick v. Celotex Corp.,* 736 F.2d 946, 958 (4th Cir. 1984). Once the moving party has met its burden, the burden shifts to the nonmoving party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). If a party fails to make a sufficient showing on one element of that party's case, the failure of proof "necessarily renders all other facts immaterial." *Id.* at 323.

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 256. "The mere existence of a scintilla of evidence" in support of the nonmoving party is not enough to withstand summary judgment; the judge must ask whether "the jury could reasonably find for the plaintiff." *Id.* at 252.

### III.    DISCUSSION

Defendants' summary judgment motion rests largely on qualified immunity grounds.  On Count I, Defendants contend Trooper Belt acted in an objectively reasonable manner in responding to Curley Spry's threat with deadly force.   They next argue, as to Count V, that Trooper Belt did not enter the home illegally because he had consent to enter or, in the alternative, his intrusion was justified by the need to rescue a suicidal occupant. On Donna Spry's unlawful seizure claim, Defendants assert that there is simply no evidence supporting the assertion that Trooper Belt forced Ms. Spry from her home, and certainly not under circumstances in which she would not have felt free to leave.  The lack of a genuine factual dispute as to Trooper Belt on Counts V and VI, they argue, compels the entry of summary judgment in favor of the WVSP as well.  As for Counts IX,

X, XI, and XIII, the state law claims, Defendants similarly move for summary judgment on grounds that no genuine factual disputes remain.

Before turning to the arguments in support of each Count, the Court dismisses the "John Doe" defendant without further delay. In their response to the summary judgment motion, Plaintiffs indicate that they only recently learned the identity of the other WVSP trooper present in the Spry home at the time of the shooting. Plaintiffs state they will seek leave to amend their Complaint to add Trooper Dotson as a defendant. Plaintiffs have not sought leave to amend their pleading, but in all likelihood the motion would be denied. After the deadlines set forth in a scheduling order have passed, Federal Rule of Civil Procedure 16 governs motions for leave to amend the pleadings. *See Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008). This standard, unlike the liberal standard espoused in Rule 15, requires a showing of good cause. Fed. R. Civ. P. 16(b)(4). Plaintiffs provide no reason for their failure to ascertain the identity of the John Doe trooper earlier. The John Doe defendant is **DISMISSED**.

A. *Count I—Excessive Force under § 1983*

In actions brought under § 1983, "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Following *Pearson*, the Court uses its discretion to apply the two-part qualified immunity inquiry set forth in *Saucier v. Katz*, 533 U.S. 194 (2001). The inquiry asks first, whether a constitutional violation occurred on the facts alleged and second, whether the right at issue was clearly established. *Hill v. Crum*, 727 F.3d 312, 321 (4th Cir. 2013) (citing *Orem v. Rephann*, 523 F.3d 442, 445 (4th Cir. 2008)). "If an officer did not violate any right, he is hardly in need of any

immunity and the analysis ends right then and there." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (internal citation and quotation marks omitted).

The Fourth Amendment's prohibition on unreasonable seizures applies to a claim that a law enforcement officer used excessive force in making a seizure. *Id.* (citing *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006)). The Court must determine whether the officer's conduct was objectively reasonable under the circumstances. *See Graham v. Connor*, 490 U.S. 386, 388 (1989); *Shultz*, 455 F.3d at 477 ("An officer's actions are not excessive if they are objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." (internal quotation marks and citation omitted)). The evidence must be viewed in the light most favorable to the nonmovant at the summary judgment stage. *See Adickes*, 398 U.S. at 157. However, "the question of whether the officer's actions were reasonable is a question of pure law." *Henry*, 652 F.3d at 531 (citing *Scott*, 550 U.S. at 381 n. 8)).

The question for the Court's consideration is whether, in viewing the evidence in the light more favorable to Plaintiffs, Trooper Belt used objectively reasonable force. In evaluating his conduct, the Court must be mindful that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. The law makes this point quite clear: a law enforcement officer "may use deadly force when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

Even before Trooper Belt arrived at the Spry residence, he certainly had "sound reason" to believe that Mr. Spry posed such a threat. Trooper Belt had been told by the 911 dispatcher that

Mr. Spry was suicidal and holding a loaded pistol to his head.[6]  He knew that Mr. Spry's wife and daughter had retreated to another area of the home because they did not feel safe remaining in the bedroom with Mr. Spry.  Trooper Belt also knew that police had tazed Mr. Spry on a previous occasion for refusing to cooperate.  (Belt Aff. ¶ 13.)  This information, understandably and legitimately so, "heightened [Trooper Belt's] safety concerns for all involved."  (*Id.* at ¶ 14.)

Trooper Belt is one of two surviving witnesses to the events that transpired within Mr. Spry's bedroom immediately following the officers' entry into the home.  By affidavit, Trooper Belt testified that he approached the door of Mr. Spry's bedroom by telling Mr. Spry "he was not in trouble."  (Belt Aff. ¶ 29.)   Trooper Belt shined his flashlight into the room to see Mr. Spry lying in bed with a pistol at his right side.  Trooper Belt testifies that as he entered the room, Mr. Spry "lifted the pistol and aimed it at me."  (*Id.* ¶ 36.)  Trooper Belt attests that he did not feel safe to back out of the room.  Confronted with a threat of deadly force, he shot and killed Mr. Spry.  Sergeant Dotson, Trooper Belt's companion and the only other surviving witness, confirmed Trooper Belt's account.  (Dotson Declaration 1, ECF No. 44-3.)

In these circumstances, the Court readily finds that a reasonable officer would have viewed Mr. Spry as posing a threat of death or serious physical injury.  Plaintiffs speculate, in response, that Trooper Belt is not telling the truth.  They perfunctorily denounce Trooper Belt's statements as "self-serving," and conclude the issue should be left to a jury.  (Pls.' Mem. at 8.)  Plaintiffs misunderstand the summary judgment standard.  Trooper Belt is obligated to come forward with

---

[6] Ms. Spry's recollection of these details had changed somewhat by the time of her deposition.  At her deposition, Ms. Spry testified that Mr. Spry was [n]ot so much [pointing the gun] at his head," but around the chest and head area.  (Donna Spry Dep. 47:5–22.)  Ms. Spry also testified that she did not believe her husband was capable of committing suicide.  (*Id.* at 48:19–23.)  Her deposition testimony does not affect the analysis, since the relevant question is whether Trooper Belt had reason to believe that Mr. Spry was suicidal, taking aim at his own head with a loaded pistol.  The evidence indicates that this was the unequivocal message communicated to Trooper Belt by the 911 dispatcher on January 29, 2014.

evidence showing the absence of a genuine dispute of material fact on Count I.  He has done so, as explained above.   The burden then shifts to Plaintiffs to bring forward facts to create a triable issue.  *Liberty Lobby*, 477 U.S. at 256.  Plaintiffs' evidence on this score is limited to two photographs.  Both depict the deceased lying face down on his mattress, arms hanging limp over the side.  In one of the two photographs taken from further distance, a pistol is visible on the floor nearby.  The Court finds that the photographs refute, rather than support, Plaintiffs' contention that Mr. Spry was not holding his pistol at the time of the shooting.  The photograph offered as Plaintiffs' Exhibit 7 depicts the pistol lying on the floor just beyond Mr. Spry's outstretched hand. (ECF No. 58.)  Thus, the location of the pistol supports witness testimony that Mr. Spry was holding the pistol at the time he was shot.

For these reasons, the Court finds that Trooper Belt did not act with excessive force in shooting Mr. Spry.  No violation of the Fourth Amendment occurred, and Trooper Belt is entitled to summary judgment on Count I.

B.      *Count V—Unlawful Entry under § 1983 and West Virginia Constitution Art. III § 6*

Warrantless searches and seizures inside a private residence are presumptively unconstitutional under the Fourth Amendment.  U.S. Const. amend. IV; *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)).  Two recognized exceptions to the warrant requirement are potentially applicable in this case: consent and exigent circumstances.   The Court concludes that Ms. Spry's statements to the 911 dispatcher, coupled with her gesture toward Mr. Spry's bedroom upon Trooper Belt's arrival at the home, could reasonably be interpreted as consent to entry the Spry residence. The Court also concludes that exigent circumstances were present.

As stated, consent is one exception to the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The standard is one of "objective reasonableness," in other words, what the typical reasonable person would have understood by the exchange between the officer and property owner. *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). "There is no question that consent to search can be implied from a person's words, gestures, or conduct." *United States v. Moreland*, 437 F.3d 424, 429 (4th Cir. 2006) (citations omitted). The determination of whether consent is voluntary requires "careful scrutiny of all the surrounding circumstances," and does not turn "on the presence or absence of a single controlling criterion." *Id.* at 226. Article III, § 6 of the West Virginia Constitution has generally been construed in harmony with the Fourth Amendment.[7] *See State v. Duvernoy*, 195 S.E.2d 631, 634 (W. Va. 1973). Consent need not be expressed verbally; it can be implied by the circumstances. *See United States v. Smith*, 30 F.3d 568, 571 (4th Cir. 1994) (finding driver gave implied consent to search his vehicle when he unlocked his car door in response to police request); *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir. 1976) ("The consent [to waive Fourth Amendment rights] may be in the form of words, gesture, or conduct." (citation omitted)).

As alleged in the Complaint, Trooper Belt rushed through the front door of the Spry residence without attempting to first secure permission to enter. The facts as developed tell a different story. Trooper Belt attests that upon approaching the Spry residence, he saw the main door to the home open. Only the outer screen door remained closed. (Belt Aff. ¶ 20.) On a cold

---

[7] In its Memorandum Opinion and Order resolving the Motions to Dismiss, the Court concluded that the question of whether Article III, § 6 of the West Virginia Constitution gives rise to a private right of action for money damages is unsettled under West Virginia law. (Mem. Op. at 18 (Feb. 1, 2017).) The Court expressed its desire to certify the question to the Supreme Court of Appeals of West Virginia. However, since Plaintiffs fail to show a genuine issue of material fact on the § 1983 and, by implication, state constitutional claims alleged in Counts V and VI, the award of summary judgment obviates the need to certify the legal question.

January morning in West Virginia, an open door could reasonably have conveyed to the troopers that Ms. Spry anticipated their arrival and entrance. Trooper Belt and Sergeant Dotson ran to the screen door and announced their presence. Trooper Belt could see Ms. Spry talking on the phone through the screen door. (Belt Aff. ¶ 12.) Without saying a word, Ms. Spry lifted her hand and gestured toward an inner room. Trooper Spry assumed she was pointing in the direction of her husband's bedroom. (*Id.* ¶ 23.) Trooper Belt entered the home without Ms. Spry's objection and proceeded in the direction she pointed, where he encountered Mr. Spry.

Ms. Spry gave a recorded statement shortly after the shooting. Her description confirms Trooper Spry's account of the events:

> Trooper: Okay. And you were in the residence, in the house, whenever the troopers arrived on scene. Is that correct?
>
> Ms. Spry: I was, yes, at the front door and met them.
>
> Trooper: Did you let them in?
>
> Ms. Spry: They opened the door.
>
> Trooper: Okay.
>
> Ms. Spry: I had the big door open and they opened the screen door and screamed, "Troopers," had their guns and flashlight in my face, yeah.
>
> Trooper: Okay. And what happened at that point?
>
> Ms. Spry: I pointed to the room where he was at and they asked his name.

(D. Spry Statement 6, ECF No. 44-2.) The Court finds a reasonable person would construe Ms. Spry's gesture as consent to enter the home and render the aid she had requested by calling 911.

Even if Ms. Spry did not consent to the entry of her home, exigent circumstances warranted Trooper Belt's entry. One such exigency obviating the requirement of a warrant is the need to protect or preserve life. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (officers witnessing a

brawl from outside the home did not violate the Constitution by forcing their way inside to break up the fight). Under this exception, law enforcement may enter a home without a warrant if they "have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." *Id.* at 398. The need to rescue a suicidal occupant would certainly come within the parameters of this exception. *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044 (6th Cir. 1992) (noting that the court was not aware of "a single case indicating that an officer's attempt to rescue what the officer believes to be a suicidal person does not constitute exigent circumstances").

The Fourth Circuit held that exigent circumstances existed in a case with even less evidence of an impending threat. *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324 (4th Cir. 2009). In that case, Cloaninger woke up one morning feeling nauseous—an adverse reaction to his prescription medication. Cloaninger placed a phone call to his doctor but, unable to reach him, described his symptoms to a staff member. The staff member knew that Cloaninger had threatened suicide on previous occasions. She later returned Cloaninger's call to inform him that help was on the way and that he would be transferred to a nearby hospital and stabilized. Local police were dispatched to conduct a welfare check at Cloaninger's house. *Id.* at 328. The officers had been told that Cloaninger made prior threats of suicide and that the police had located firearms in the home when responding to those threats. After several failed attempts to communicate with Cloaninger through his front door, the police forced their way into the home to apprehend him. The Fourth Circuit upheld the district court's grant of summary judgment to the police officers, finding that the "initial . . . call, coupled with knowledge of Cloaninger's prior suicide threats and the belief that he possessed firearms, established to an objectively reasonable police officer that Cloaninger was a danger to himself." *Id.* at 334.

This case presents similar facts. But here, Trooper Belt knew that Mr. Spry had made contemporaneous threats of suicide—not just that he had made such threats in the past, as was the case in *Cloaninger*. Trooper Belt arrived at the Spry home with an objectively reasonable basis to believe that Mr. Spry was in imminent threat of serious bodily injury. Trooper Belt was a 30 minutes' drive away from the Spry home when he accepted the dispatch. He radioed the dispatcher several times for directions as he made his way to the rural area where the Spry family resided. Each time, the dispatcher, who remained on the phone with Donna Spry, continued to impress upon him the exigency of the situation. The dispatcher repeated two salient details: Mr. Spry was "very suicidal" and holding a 9-milimeter pistol to his head. (911 Tr. 19:8–9, 19:23–20:3.) The dispatcher gave Trooper Belt further information, all of which underscored the need to reach Mr. Spry's bedside without delay. The dispatcher told Trooper Belt that Donna Spry wanted to leave her hiding place to talk Mr. Spry into putting the gun down. Trooper Belt, through the dispatcher, discouraged her and told Ms. Spry to stay put. (*Id.* at 21:24–22:1.) The dispatcher later told Trooper Belt, still en route to the home, that Mr. Spry "refused to put the gun down" and could be heard pulling the trigger on the pistol, possibly "playing Russian routlette." (*Id.* at 23:19–24.) When Trooper Belt radioed later for an update, the news was the same: Mr. Spry had a 9-millimeter to his head and his wife and daughter had locked themselves in a back bedroom. (*Id.* at 24:9–12.) Just before Trooper Belt arrived at the home, the dispatcher advised that Mr. Spry was "extremely upset" and had been "tased in the past." (*Id.* at 25:22–23.)

Plaintiffs do not dispute these facts. Still, they argue that no exigency existed because Donna Spry was present at the front door upon Trooper Belt's arrival and could have answered the officers' questions. The suggestion is untenable given the circumstances presented. Trooper Belt had advised Donna Spry, through the 911 dispatcher, to stay out of her husband's room. Her

presence at the front door told him nothing about Mr. Spry's wellbeing. Further, the fact that Trooper Belt had not personally observed anyone in danger is irrelevant. Trooper Belt had been called upon to render aid at the home of a "very suicidal" occupant. Just minutes before his arrival, Trooper Belt had been told that the suicidal man was pulling the trigger on his loaded handgun, emitting a "clicking" noise. The suggestion that a law enforcement officer should have lingered outside the home in such a situation is preposterous.

The Court finds that the circumstances facing Trooper Belt upon his arrival to the Spry home were exigent. Plaintiffs have submitted no evidence proving that Trooper Belt violated Mr. Spry's Fourth Amendment or West Virginia constitutional rights, and qualified immunity bars suit on Count V.

C.     *Count VI—Unlawful Seizure under §1983 and W. Va. Constitution Art. III § 6*

A seizure occurs "if, in view of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). The seizure of a witness to a police shooting must be reasonable; otherwise, it violates the Fourth Amendment. *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006); *Figg v. Schroeder*, 312 F.3d 625 (4th Cir. 2002). In judging reasonableness, courts look to "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas*, 443 U.S. 47, 51 (1979) (citation omitted).

The Complaint alleges that Trooper Belt violated Donna Spry's Fourth Amendment rights by forcing her out of her home following the shooting and requiring her to remain in the "freezing cold" for a time of unspecified duration. (Compl. ¶ 135.) As Plaintiffs admit in their responsive brief, the available evidence is inconsistent with the allegations in the Complaint. Trooper Belt

attests by affidavit that following the shooting, he encouraged Donna and Britney Spry to exit the home, in part for their own emotional wellbeing and in part to prevent contamination of the scene. (Belt Aff. ¶ 43.)  Plaintiffs refused.  Trooper Belt then returned to his cruiser and did not reenter the Spry residence.  He never forced them from the home.   (*Id.*)

Donna Spry's deposition testimony supports his account:

Q.  Did they force you to go outside after the shooting?

A.  No.

Q.  Did they force you into another part of the house?

A.     Force? No.

. . .

A.  [W]hen I heard my son's truck pull up I ran outside.

. . .

Q.  The police didn't force you outside your home, though.  Is that right?

A. No.

Q.  I'm correct about that?

A.  You're correct.

(D. Spry Dep. 63:22–64:2, 64:21–22, 65:23–66:3.)

To the extent Britney Spry intends to join this claim, her arguments have no merit either.[8] Britney Spry testified that law enforcement asked her to give a statement following the shooting and that she did not feel free to leave the home to join her mother outdoors.  She admitted that at

---

[8] To be clear, the Complaint brings Count VI on behalf of Donna Spry alone, and the allegations forming the basis of this claim do not mention Britney Spry.  The Court briefly considers Britney Spry's claim for unlawful seizure because Plaintiffs indicate in their response to the summary judgment motion that Britney Spry intends to join in Count VI.  Plaintiffs have not amended their Complaint to rectify this error, nor have they requested permission to do so.

no point did she ask the officers if she could leave the home, (B. Spry Dep. 34:19–20, ECF No. 44-2), nor did the officers forbid her from leaving. (*Id.* at 52:20–22.) Plaintiffs' counsel repeatedly asserts that Donna and Britney Spry were separated for five hours, but there is no evidence in the record indicating the length of their separation. Britney Spry testified only that she remained in her bedroom with her mother for about 30 minutes following the shooting, at which time her mother went outside and she went to the living room to give a statement. "The only thing that they told me was I had to give a statement," she explained, "so I felt like I had to stay there." (*Id.* at 54:7–8.) The Court cannot find that a seizure occurred under these circumstances. Even if there were a seizure, the available evidence supports only one conclusion: Britney Spry's brief detention was justified by the need to gather evidence in the wake of her father's death. Summary judgment is awarded to Defendants on Count VI.

D. *Count IX—Wrongful Death*

Wrongful death claims in West Virginia are governed by West Virginia Code § 55-7-5. The statute states, in part, "[w]henever the death of a person shall be caused by wrongful act, neglect, or default, and the act, neglect or default is such as would (if death had not ensued) have entitled the party injured to maintain an action to recover damages in respect thereof, then . . . the person who . . . would have been liable if death had not ensured, shall be liable to an action for damages." § 55-7-5. The Supreme Court of Appeals of West Virginia has held:

> In the absence of an insurance contract waiving the defense, the doctrine of qualified or official immunity bars a claim of mere negligence against a State agency not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29–12A–1, *et seq.,* and against an officer of that department acting within the scope of his or her employment, with respect to the discretionary judgments, decisions, and actions of the officer.

Syl. Pt. 7, *Jarvis v. W. Va. State Police*, 711 S.E.2d 542 (W. Va. 2010).

The Complaint alleges that Trooper Belt was acting within the scope of his employment at the time of the shooting, (Compl. ¶ 17), and Plaintiffs have not developed evidence to the contrary. Summary judgment in favor of Defendants will be granted on Count IX.

E.      Count X—Battery

In Count X, Donna Spry brings battery claims on behalf of the deceased, Curley Spry, as well as on her own behalf.   The battery claim brought by Mr. Spry's estate cannot proceed because West Virginia claims for battery do not survive death.  *See Ray v. Cutlip*, No. 2:13-cv-75, 2014 WL 858736, at *2 (N.D. W. Va. Mar. 5, 2014) (citing W. Va. Code § 55-7-8a).   Further, as for the individual battery claim, Defendants point out that Ms. Spry never testified that Trooper Belt intentionally touched her in a harmful or offensive manner.   (D. Spry Dep. 72:5–7 (testifying that she did not remember whether she hung up the 911 call or whether a WVSP trooper forcibly took the phone from her to end the call).)  Trooper Belt testified that he did not do so.  (Belt Aff. ¶ 50.)

Plaintiffs have failed to respond with evidence showing a genuine dispute of material fact on the battery claim.  Though they appear to oppose the entry of summary judgment on Count X, their response merely sets forth an irrelevant point of law.[9]  Defendants are entitled to summary judgment on Count X.

F.      Count XI—Trespass

"Under West Virginia law, to constitute a trespass, the defendant's conduct must result in

---

[9] In opposing the entry of summary judgment on Count X, Plaintiffs write:
> West Virginia's wrongful death statute is an appropriate gap-filler such that a § 1983 excessive force claim based on use of lethal force against fugitive survived fugitive's death to the extent the claim sought recovery under a wrongful death theory; federal remedy under § 1983 was supplementary to state remedy, and survival of §1983 claim was needed to protect the federally created rights.

(Pls.' Mem. at 22.) Defendants indicate that Plaintiffs plagiarized this language from a Westlaw headnote annotation in *Pethel v. West Virginia State Police*, 568 F. Supp.2d 658 (N.D. W. Va. 2008).  The Court is disappointed to see that their assertion appears to be correct.

an actual, nonconsensual invasion of the plaintiff's property, which interferes with the plaintiff's possession and use of that property." *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 96 (4th Cir. 2011) (citing *Hark v. Mountain Fork Lumber Co.*, 34 S.E.2d 348, 352 (W. Va. 1945)). Law enforcement officers are privileged to commit trespass so long as they do so in an objectively reasonable exercise of their authority. *See Patterson v. City of South Charleston*, No. 2:12-cv-01964, 2013 WL 1337317, at *4 (S.D. W. Va. Mar. 29, 2013) (citing 75 Am. Jr. 2d *Trespass* § 78). As explained in the discussion of Count V, the unlawful entry claim, Trooper Belt's entry onto the Spry property was lawful because he either had consent or was privileged to enter to render aid to a suicidal occupant within. The motion for summary judgment on Count XI is **GRANTED**.

G.     *Count XIII—Intentional Infliction of Emotional Distress*

All that remains is Count XIII, the intentional infliction of emotional distress claim. In order to establish a claim for intentional infliction of emotional distress ("IIED"), a plaintiff must show the following:

> (1) [T]hat the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Syl. Pt. 3, *Travis v. Alcon Laboratories, Inc.*, 504 S.E.2d 419 (W.Va. 1998). To elaborate, the first element requires a plaintiff to show that the conduct complained of is "so outrageous in character, and so extreme in degree, as to go *beyond all possible bounds of decency*, and to be regarded as *atrocious and utterly intolerable in a civilized society.*" *Keyes v. Keyes*, 392 S.E.2d 693, 696 (W.Va. 1990) (emphasis in original) (quoting *Harless v. First Nat'l Bank in Fairmont*, 289 S.E.2d

692, 703–04 n. 20 (W.Va. 1982)).  In evaluating a motion for summary judgment on this element, the Court's role is to determine the "legal question" of "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress."  Syl. Pt. 8, *Hatfield v. Health Mgmt. Assocs. of W. Va.*, 672 S.E.2d 395 (W.Va. 2008) (quoting Syl. Pt. 4, *Travis*, 504 S.E.2d 419).

The Complaint does not identify the specific conduct by Defendants that supposedly constituted outrage.  (*See* Compl. ¶ 167.)  Plaintiffs' response to the summary judgment motion does not clarify matters.  Plaintiffs devote a mere paragraph to the discussion of their IIED claim, highlighting a single statement reflected in the transcript of the 911 call.  While on the line with Donna Spry on January 24, 2014 and apparently having heard gunshots, the 911 dispatcher asked, "Ma'am, what have they done?" (911 Tr. 15.)  Plaintiffs claim, without further explanation, that this statement supports their claim for IIED.  (Pls.' Mem. at 23–24.)   The Court is unpersuaded. As explained *supra*, the evidence submitted in this case demonstrates that Mr. Spry pointed his weapon at Trooper Belt when the police officer entered the bedroom.  Trooper Belt's responsive act of shooting Mr. Spry was not wrongful under these circumstances, let alone outrageous.  The Court cannot identify any other conduct by Defendants that would meet this "high standard," *Keyes*, 392 S.E.2d at 696, and therefore grants summary judgment on behalf of Defendants on Count XIII.

## IV.   CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment is **GRANTED**.   (ECF No. 44.)  The Motion to Strike is **DENIED**.  (ECF No. 63.)  The Court enters summary judgment in favor of all Defendants and **DISMISSES** the Complaint, in its entirety, with prejudice.  The Court **DIRECTS** the Clerk to remove this action from the docket of the Court.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:     April 24, 2017

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE